Joel GARCIA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–89–00652–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 13, 1990.

**818**

John B. Holmes, Dist. Atty., Mary Lou Keel, Asst. Dist. Atty., for appellant.

Gregg Glass, Wayne Bailey, Houston, for appellee.

Before EVANS, C.J., and DUNN and O'CONNOR, JJ.

## OPINION

DUNN, Justice.

This is an appeal from a conviction of murder. The jury found appellant, Joel Garcia, guilty and assessed punishment at 30 years confinement and a $10,000 fine.

Appellant's first point of error contends that the trial court erred in refusing to require the State to articulate a race-neutral basis for peremptorily striking every black venire person, thus violating appellant's due process right to be judged by a fair cross-section of the community, as guaranteed by the sixth and fourteenth amendments of the United States Constitution and article 35.261 of the Code of Criminal Procedure.

In support of appellant's contention that the State's use of its peremptory challenges was racially motivated, appellant stated:

DEFENSE: It appears to me that every black juror [sic] has been struck, that was up to 42, that can be struck by the prosecution....

Even though my client is Hispanic, I think my client would be under the same protection whether he is black or Hispanic.

. . . . .

DEFENSE: Yes, Your Honor. Pursuant to Article 35.261 of the Code of Criminal Procedure, your Honor, we're objecting to the apparently total exclusion of all the black veniremen or venirewomen on the panel which were struck by the prosecution in eliminating jurors from this particular jury.

I would like the record to reflect that Juror No. 4, Vicky Menard, is a black person; that Juror No. 15, Nola Jones, is a black person—not juror but venire person—; that venire person 17, Addie Moses, is a black person; that venire person, Marsha Lister, No. 24, is a black person.

That these are all the black persons in the venire up through No. 42 through which we were making our strikes. I believe that the Defendant is entitled to have a race-neutral selection of his jury, and that there are no, at least, adequate grounds for striking these persons outside of their apparent race. That their striking, in effect, was not a race-neutral act.

The trial court overruled appellant's motion.

■ The Supreme Court has held that a defendant may establish a prima facie case of discrimination. *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). To accomplish this: (1) the defendant must show that he is a member of a cognizable racial group and that the prosecutor exercised his peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant is entitled to rely on the undisputed fact that peremptory challenges constitute a jury selection practice that permits " 'those to discriminate who are of a mind to discriminate' "; and (3) the defendant must show the facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude venire persons from the jury on account of their race. *Id.* After the defendant has made a prima facie showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging the venire persons. *Id.* at 98, 106 S.Ct. at 1724.

■ Appellant did not establish a prima facie case of discrimination under *Batson*. Appellant cannot complain under *Batson*

that all black persons were stricken from the venire because appellant is Hispanic, not black. Appellant failed to establish a prima facie case of discrimination under *Batson.*

Appellant asserts that he has standing to challenge the exclusion of a black venire person. Appellant relies on *Seubert v. State,* 749 S.W.2d 585 (Tex.App.—Houston [1st Dist.] 1988) (a person has no standing under *Batson* to challenge the use of peremptory challenges to exclude venire persons of a different race but does have standing to assert violations of due process and the sixth amendment). This Court's decision has been reversed in *Seubert v. State,* 787 S.W.2d 68 (Tex.Crim.App.1990) (*"Seubert II"*). The Court of Criminal Appeals held that a defendant has no sixth amendment right to a petit jury that is fairly representative of the community, relying on *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 805, 107 L.Ed.2d 905 (1990). *Seubert II,* 787 S.W.2d at 69–70. Therefore, appellant has no right to challenge the exclusion of black venire persons under *Batson* or the sixth or fourteenth amendment of the United States Constitution.

■ However, appellant also challenges the exclusion of black venire persons by use of peremptory strikes under the Code of Criminal Procedure, which provides:

[A] court shall grant the motion of a defendant for dismissal of the array if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race. If the defendant establishes a prima facie case, the burden then shifts to the attorney representing the state to give a racially neutral explanation for the challenges.

Tex.Code Crim.P.Ann. art. 35.261 (Vernon Supp.1988). Unlike *Batson,* article 35.261 does not require the defendant to be of the same race as the challenged venire persons. *Atuesta v. State,* 7.88 S.W.2d 382, 384 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd); *Oliver v. State,* 787 S.W.2d 170, 173 (Tex.App.—Beaumont 1990, pet. granted). Thus, even though appellant is Hispanic and the challenged venire persons were black, appellant established a prima facie case of discrimination under article 35.261 for the exclusion of all black venirepersons. The burden shifts to the State to demonstrate the prosecutor's use of peremptory challenges was racially neutral.

■ On May 24, 1990, this Court abated this appeal and ordered the trial court to conduct a hearing to determine if the State's use of its peremptory strikes to exclude black venire persons from the jury was racially neutral. At the hearing, the trial court found that the State failed to introduce any evidence of a nondiscriminatory reason for challenging the venirepersons and recommended that appellant be granted a new trial.

The evidence adduced at the hearing shows four venire persons were black. On his juror information sheet, Sid Crowley, the prosecutor in appellant's trial, placed "BF" next to the names of each of these venire persons. Crowley testified that "BF" indicated a black female. No other notations indicating race appear on the information sheet. Crowley stated that he did not recall the reason for striking any particular venire person but stated that he did not strike any of the black venire persons for the sole reason of her race. Crowley was unable to offer any explanation for his use of peremptory challenges. Thus, the State failed to show the prosecutor used his peremptory challenges in a racially-neutral fashion.

We sustain appellant's first point of error.

In his eighth point of error, appellant contends that the evidence is insufficient to support his conviction. Even though reversal is required on other grounds, appellant is entitled to have the sufficiency of the evidence reviewed. *Froyd v. State,* 633 S.W.2d 884, 885 (Tex.Crim.App.1982).

Angela Haviland, the victim, was shot on July 1, 1988, as she stood in the doorway of an apartment.

Debbie Hardy, the victim's mother, testified that the victim was 12 years old. A week before the shooting, there was a pool party at the apartment complex; shortly before the party ended, there was a fight, but when Debbie Hardy threatened to call the police, everyone took off running. Debbie Hardy did not recall seeing appellant at the party.

Bill Hardy, Debbie Hardy's ex-husband, testified that about one week before the shooting, he attended the pool party at the apartment complex. A fight broke out; Bill Hardy tried to stop the fight by grabbing appellant, and three of appellant's friends jumped on him. The fight ended after about 20 to 30 minutes when someone yelled they had called the police.

Luis Sardon (also referred to as Luis Sardon Martinez), a 12-year old child, testified that he met the victim at the pool party; that appellant got into a fight with Debbie Hardy; and that appellant was acting weird. As appellant was leaving the party, Sardon heard appellant say, "I'm going to get you back." Sardon supposed appellant's statement was directed at Debbie Hardy, but he did not know if she heard the remark.

Sardon testified that on the day in question, he was inside his apartment with friends when Misty Pine, a little girl named Shannon, and the victim came to the door; he stood in the doorway and talked a little to the victim and Pine. When the victim was shot, he saw her fall down, and saw blood coming from her head. Sardon testified that he saw the barrel of appellant's gun through a hole in the patio fence; he saw appellant running from the apartment toward the pool. Sardon said appellant was wearing blue jeans and a black cut-off T-shirt with white lettering, and described appellant as having shoulder-length hair. Sardon stated that he went to the police station to give a statement and identified appellant in the line-up as the person he had seen running from his apartment.

Misty Pine, a 12-year old child, testified that she and the victim were good friends and, on the day in question, had spent the day together. While they were babysitting, they went to Sardon's apartment to talk with him and to look at his stereo. Pine stated that as they stood in the door of Sardon's apartment, she saw a man walking on the sidewalk; the man was not very tall, had long black hair and a chubby build and was wearing a black sleeveless T-shirt with a rock station emblem on it. She stated she heard someone shout "watch out," heard a big bang, and then saw the victim fall backwards. Pine fainted and did not remember what occurred after the shooting.

Dwayne Huffman testified that he lived in the Breckenridge Court Apartments. On the day in question, the victim, Pine, and Shannon asked him to walk them to see a person named Lee; he agreed, and they began walking in front of him. He dropped his cigarettes, and as he stooped to pick them up, he heard a shot. He stated that as he looked up, he saw appellant running, and recognized him when appellant turned his head toward him. Appellant was carrying a pistol, wore a muscle shirt and blue jeans, had long black hair, and was short and chubby. On cross-examination, Dwayne stated that a week before the incident, he attended the pool party in the complex, saw appellant there, but did not see appellant involved in the fight.

Frank Huffman testified that he had known appellant approximately four to five months before the incident. When he returned to the apartment complex on the day in question, he heard a loud firecracker sound. Frank stated that as he continued walking, he saw appellant running toward him, but when appellant saw him, he changed directions and ran toward the pool. After the police officers arrived, Frank told them appellant was responsible for the shooting and showed them where he lived. His identification of appellant and appellant's clothing was the same as the other State's witnesses' identifications.

Detective Frank Pratt testified that, around 6:10 p.m., he received a call regard-

ing a shooting and arrived at the Breckenridge Court apartment complex 40 minutes later. He was informed by Frank Huffman that appellant was responsible for the shooting. Pratt stated that he then proceeded to the Sentinel Apartments (an adjoining complex separated by a fence) and was allowed inside by Patricia Smith, appellant's girlfriend where he found appellant in the kitchen drinking beer. He placed appellant under arrest. Pratt's description of appellant's clothing fit the description given by other State's witnesses.

Defense witness, Sandra Compton, testified that she had known appellant for approximately three years. Compton stated that on July 1, 1988, from 5:30 to 5:55 p.m., she was standing outside in her front yard and saw appellant playing with her children.

Rudy Mata testified that he had known appellant for five to six years and that on the day in question, appellant called him to come over to Smith's apartment. Mata met appellant at Smith's apartment between 4:35 and 4:40 p.m.; he and appellant left the apartment after five or 10 minutes and went to the liquor store. They were at the liquor store for about three or four minutes, and then they went to his sister's house arriving about 5:00 p.m. Around 5:30 to 5:45 p.m., he and appellant gave his sister a ride to Western Union and left Western Union around 6:00 p.m. They then went to a lake behind the Timber Lake Apartments for about 30 or 40 minutes and drank a few beers; they arrived back at Smith's apartment between 7:00 and 7:15 p.m. Mata stated that he and appellant were at the apartment less than 10 minutes when appellant was arrested.

Appellant testified that a week before the shooting, he attended the pool party at the Breckenridge Court Apartments, there was a fight, and he was involved, but he did not get into a fight with Bill Hardy. Appellant admitted that he had a casual conversation with Debbie Hardy, but denied that they got into a shouting match.

Appellant stated that on the day in question, he left work at 4:00 p.m. and stopped by his apartment for approximately 10 minutes arriving at Smith's apartment in Sentinel Park at 4:47 or 4:48 p.m. Approximately 15 to 20 minutes after he arrived, Mata stopped by Smith's apartment; he and Mata went outside on the patio and talked for five or six minutes, and then they went to the liquor store. Appellant testified that he and Mata talked to the owner of the liquor store for approximately 10 to 15 minutes, left the store between 5:30 and 5:45 p.m. and arrived at appellant's brother's house before 6:00 p.m. About 6:15 p.m., appellant and Mata left his brother's house to drop his sister-in-law off at Western Union and were at Western Union for approximately 10 minutes. He and Mata then drove to the Timber Lake Apartments and were there about 10 to 15 minutes to finish drinking their beers. Appellant stated that he returned to Smith's apartment around 7:15 p.m., and as soon as he pulled into the parking lot, someone told him he had been accused of shooting a little girl. A few minutes later, the police officers arrested him. Appellant denied he knew the victim or had ever seen her; he also denied shooting her. In addition, appellant denied he knew the victim's mother by name or knew Sardon or Pine.

Hasmukh Patel, owner of J & M liquor store, testified that on the day of the shooting, appellant and Mata entered the store between 5:15 and 5:20 p.m., purchased a 12–pack of beer and talked with him for 10 to 20 minutes; their discussion concerned the police cars and ambulances speeding by the store.

■ Appellant argues that in reviewing the sufficiency of the evidence, we must consider the evidence in his bill of exceptions as well as the testimony of witnesses at trial. Appellant relies on *Porier v. State*, 662 S.W.2d 602, 605–606 (Tex.Crim. App.1984), to support his argument. The court in *Porier* held that in reviewing the sufficiency of the evidence, it would review both proper and improper evidence admitted before the jury. *Id.* In the present case, the bill of exceptions was not before the jury. Therefore, we follow our usual practice in reviewing sufficiency of the evidence.

In reviewing the sufficiency of the evidence, the appellate court must view the evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim.App.1989). If, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the judgment will stand. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). This standard applies to circumstantial evidence as well as direct evidence. *Christian v. State,* 686 S.W.2d 930, 934 (Tex.Crim.App.1985). This standard of review incorporates the principle that a conviction cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except guilt of the appellant. *Id.*

A person commits murder if he:

(1) intentionally or knowingly causes the death of an individual; [or]

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

Tex.Penal Code Ann. § 19.02(a) (Vernon 1974).

Appellant contends that the inconsistencies in the testimony of the State's witnesses support an inference other than his guilt. The evidence establishes that a week before the shooting, appellant was involved in a fight at a pool party attended by the victim's mother, Debbie Hardy, and that when Bill Hardy tried to break up the fight, three of appellant's friends jumped on him. Sardon testified that as appellant was leaving the party, appellant said, "I'm going to get you back," which Sardon assumed was directed at Debbie Hardy although he did not know if she heard it. Sardon also testified that he saw the barrel of the gun through a hole in the fence around his patio, heard a shot, saw the victim had been shot in the head, and saw appellant running from the apartment.

Sardon identified appellant at a police line-up as the man he saw running from the apartment. Misty Pine testified she saw a man, who matched the description of appellant, walking by the apartment shortly before the victim was shot. After he heard a shot, Dwayne Huffman also saw appellant running with a pistol in his hand. In addition, Frank Huffman saw appellant running towards him shortly after he heard a shot; appellant changed directions when he saw Frank.

All the State's witnesses described appellant as having a chubby build and shoulder-length hair and wearing blue jeans and a black T-shirt with white lettering. Pratt testified that when he arrested appellant, appellant's clothing and appearance matched that given by other State's witnesses. Viewing the evidence in the light most favorable to the verdict, we find the evidence sufficient to support a conviction for murder beyond a reasonable doubt.

We overrule appellant's eighth point of error.

Due to the disposition of appellant's first point of error, we do not address his other points of error.

We reverse the judgment and remand the cause for a new trial.